Good morning everyone and welcome. Judge Hamilton and I are delighted to welcome Judge John Lee from the Northern District of Illinois who is sitting with us today by designation. Thank you for having me. And with that we'll call our first case which is Rhodes v. Dittmann, case number 17-2223. May it please the court, Vanessa Eisenman on behalf of the petitioner Olu Rhodes. This is an unusual habeas case as three different courts have come to three different decisions on Mr. Rhodes' confrontation claim. It was made even more unusual when the state failed to raise harmless error as a defense in the district court and then again when the state decided not to address its waiver in this court. Simply put, the state's waiver of harmless error should be enforced. As an initial matter, this issue is very clearly before this court and within the scope of the Certificate of Appealability. The district court's decision was only on the confrontation claim and the district court granted a Certificate of Appealability on that one claim. There's nothing in the language, excuse me Judge. Judge also ordered briefing precisely on this question so it seems unusual to think that it's not within the CA. I agree, I agree Judge. Getting past that, the state makes no other argument to defend its waiver. The state does not dispute that it did not raise harmless error in the district court despite the fact that Rhodes put the state on actual notice of its waiver in its reply brief back in 2014. The state did nothing after that. A year passed before the district court even ordered briefing on that issue and the state did nothing. The state also doesn't defend the district court's decision and what the district court did is it raised this issue based on a misreading of Breck. It erred as a matter of law in finding that harmless error is not an affirmative defense which it is, but the district court thought that it was part of the petitioner's case. And as we lay out in our brief, that's based on a misreading of Breck. What the district court seemed to do was to read Breck without reading O'Neill after it, which clarified that the exact language that the district court relied on in Breck did not mean that harmless error was no longer a part of the, was no longer an affirmative defense. It's not part of the petitioner's burden of proof. And every court, appellate court that has analyzed this issue has agreed with that. Every court that I've found has found that And the only question is, if you're not going to enforce the waiver, the question is whether to enforce the waiver or to decide whether you should raise the issue sua sponte, and that's only when the harmlessness of the error is certain. Now this court has not decided whether district courts have that authority, but even if it did, that's not what the district court did here. It never found that the harmlessness of the error was certain. It found that it not true. Well, that discretionary calculus about the waiver of the harmless error issue is from the Gio Venetti case, obviously, but it, that case was not dealing with state habeas. It was a federal claim and was grounded in Rule 52 of the Rules of Criminal Procedure. But this court in Sanders and many other courts across the country have kind of found that the Gio Venetti factors to be relevant even in habeas cases. This court in Sanders said, if harmless error is not raised in a district court, it's waived. And the only time that we're going to overlook it is when we've done kind of an analysis similar to that Gio Venetti case, even though that, as you pointed out, correctly pointed out, was not a habeas case. There's a very practical dimension to that rule, right? I mean, that is, a reviewing court always needs to worry about whether what it's doing is just an empty gesture. We may have more than one of those to worry about today, but that's for the future. Could I ask you, Ms. Eisenman, about the way NARI, the petitioner's sister's testimony, was presented Is it correct that the prosecution introduced a number of photographs of her in her condition just after the beating that the prosecution contended had been arranged by Mr. Davis? Yes, that's true. I haven't seen those yet, have you? No, I haven't. But from the transcript it appears that there were multiple photographs introduced, diagrams, maps, more than 60 pages of transcript was devoted to this beating administered supposedly at his direction the day before he was murdered. And is it correct that those photographs were displayed in the closing arguments? I believe that that's correct. Do you, and I'll ask to state this, but is there any reason to do that other than to convince the jury that NARI's brothers would have been so enraged at the man who was responsible that they would have had a motive to kill him? No, and there's no way they'd get those photos in without NARI testifying. She had no information about what happened the day of the incident, the day of the murder. She was only called as a motive witness, and as Your Honor correctly pointed out, to get these photos, the state doesn't care if NARI doesn't think that Davis was responsible for her beating. What they care about is showing the jury that this is what NARI looked like when she came home. And even if her brothers reacted calmly at first, this is sufficient, these photos are sufficient provocation that they would have wanted to avenge her beating. And NARI is also the only witness that could have said that her brothers had that knowledge to know that Davis was involved. No other witness can say that. NARI comes home like this and she tells her brothers that Davis is involved. But the cross-examination that was cut short made the state's motive argument more powerful. It did not undercut it. So I don't understand why the defense attorney wanted to pursue this line of questioning in the first place. It was not helpful to the defense. I think it was, Judge, and here's why. It's because the jury had already heard that Davis had beaten NARI on several other occasions, right? So the trial court allowed the jury to hear that information. The best way for the defense to rebut that motive theory, okay, look, there's all this provocation, all this reason that her brothers would want to go out and do this, right? Well, the reasons the defense attorney wanted to put in this cross-examination that was curtailed is because there was another very similar incident where NARI's orbital bone had been broke, essentially something very similar. And in that case, Davis himself was responsible for it. But she not only had she told her brothers that Davis was responsible for it and they didn't do anything. So if you have this case that hinges on... But that's the part that he was not allowed to ask. That's right. Did I mishear your question? I'm sorry. No, that's indeed what I'm focusing on because that's where the cross-examination was cut short. So the jury never got a chance to hear that there was a very similar incident that was perpetrated by Davis himself and that the brothers knew about it, but that there was no reaction from them. Right. But the most reasonable inference from the history of domestic violence between the murder victim and the sister of the defendant is that this final beating was the last straw, as the state Supreme Court put it, not the inference that the defense attorney was seeking to place before the jury, which is that, well, he didn't retaliate then, so he couldn't have retaliated now. I disagree. I mean, given the history. I think that that is one reasonable inference, but I don't think you get to... That is one reasonable inference, but I think another truly reasonable inference, and that's what the Wisconsin Court of Appeals found that sees these decisions every single day and certainly does not find constitutional violations every single day, found that the jury could have reached the last straw conclusion, but it also could have reached, if it had this information, could have reached the conclusion that defense counsel was trying to get it to realize is that, listen, this evidence was coming in whether the defense counsel wanted it to or not. The trial court had already ruled that this was admissible to show motive, right? So the best way to combat that is to say that, look, no, this is not actually as relevant to motive as you think it is because this happened before and there was no retaliation. And I just want to point out, too, that the question before this court is not whether there's harmless error. It's whether there is certain harmless error. And the fact that the Wisconsin Court of Appeals already found it was the only court to address the harmless error issue and found that there was no harmless error should be enough to meet that standard. Ms. Heisman, if I can ask a question. So during her affirmative testimony on examination, Nari basically undermined the state's motive case, right? Because she said that no, when her brothers found out about the most recent incident, they seemed calm, right? And so the cross-examination, would you agree, wasn't intended or targeted toward to contest Nari's credibility or reliability as a witness, but it was an effort to obtain other affirmative evidence that would bolster the defense's case. Is that correct? Yes, I would agree with that. It's exculpatory evidence. It's not impeachment evidence, but I argue that that's even more critical. It's exculpatory evidence. So along those lines, if the defense had wanted to call Nari as a witness in its own case and ask the same questions on a direct examination and a district court prohibited them from doing that, would that be a violation of the Confrontation Clause? And if not, then what's the difference? I think the difference is that this was the state's witness. It wasn't a defense witness. This was a state's witness called specifically by the state to prove its motive case. This was the only witness that was called for motive. That was her only information. She didn't have any information about what happened later on that day. She may have undercut the state's case somewhat by saying they didn't initially react, but the state didn't care about that. The prosecutor didn't buy that. He certainly argued the contrary in closing. No, he held up the photos and said that, no, this is sufficient provocation. I don't care what they did initially. She doesn't know what happened the next day. She wasn't there. Could I maybe suggest, I think this is a really interesting question when we get into kind of the constitutional doctrine here, because I was trying to imagine what happens if the defense needs to bring this evidence in, let's say, through another witness, Nari's mother. Then we'd be talking about the right to present a defense, the compulsory process clause. In essence, it's the right to a fair trial. These are two dimensions of it that are kind of opposite sides of the same coin, cross and presenting your own evidence. Here, where it's the state's evidence where the defense is just asking to put on the rest of the story, in essence, you can kind of frame it either way. Exactly. The way I thought about this, too, is Rhodes shouldn't have to take the stand himself in order to give himself his confrontation rights that he should have gotten. Could I ask you a quick question, counsel, about, this is not a claim that was presented, and I recognize that, but it seemed like an awful lot of the state's evidence here was coming in through what I would have called hearsay. That is, by impeachment of Ms. Dotson, Rhodes' girlfriend, and impeachment of other witnesses who gave statements to the police. Did those all come in as substantive evidence under Wisconsin law? I'm sorry. I don't know. I'm sorry. I didn't really contemplate that question. Referring to all of this, just to sum up, I really think this is the perfect case to enforce the state's waiver at this time, to be giving the state the benefit of the doubt on this. This harmless error is the most common defense that should be raised in these cases. The state didn't raise it, and even after Rhodes put the state on notice for it, and I think that that means something, especially considering the state didn't even, chose not to address its waiver to this court. I think this is a case where the state's waiver should be enforced, and even if not, remember that this court is not asking whether there is harmless error. It's whether there is certain harmless error, and in a case like this, where you see that the co-defendant was acquitted, and the Wisconsin Court of Appeals says no harmless error, the answer to that certainty question has to be no. I'll save my remaining time for rebuttal. Thank you. Thank you. Good morning. My name is Sarah Schaefer. I'm an Assistant Attorney General for the state of Wisconsin, and I represent the respondent in this case, Warren Dittman. The issue in front of this court today is whether the Wisconsin Supreme Court unreasonably applied controlling federal case law when it determined that Mr. Rhodes' right to confrontation was not violated when the trial court limited this cross-examination of his sister, Nari. This is not a direct appeal. In this case, the Wisconsin Supreme Court relied on U.S. Supreme Court cases Davis v. Alaska, Delaware v. Van Arnstall, and when it discussed those cases, it discussed the cases where it showed in those cases the defense counsel was trying to get to the credibility, to the believability, to the reliability to impeach the witness. And when the Wisconsin Supreme Court had this case, they said, we do not have that here. What we have, and if we did, they said, we might have a different outcome. But what we have here is we have a state's witness, and the defendant is trying to impeach the state's, I'm sorry, is trying to contradict the state's motive. It was not a case where the Wisconsin Supreme Court looked at all of the U.S. Supreme Court cases, and the Wisconsin Supreme Court took the purpose of the limitation of the cross-examination. They took that into consideration, and they reasonably applied Davis v. Alaska and Delaware v. Van Arnstall to determine that the trial court did not impermissibly... Ms. Schaefer, my concern here is, I think you've got two former and one former, and one current trial court judges on this panel, who I think all understand that these are difficult lines to draw in court, and a fair amount of discretion will be left to a trial judge. But when I look at the Wisconsin Supreme Court's explanations for affirming the trial judge's call here to cut off the cross-examination at basically the worst possible time for the defense, I look at these rationales, and they all make a lot of sense about confusing the issues, misleading, potentially wasting time, and so on. They make sense until you recognize that the state has been allowed to go into this issue of motive in loving detail. As I say, all the photos, all the 60-plus pages of transcript, all from Nari on this issue of motive, and then the defense is not allowed a fair opportunity to respond. The defense was presented an opportunity to respond before the state objected to the specific act of the orbital bone. There are three pages, and it's pages 15, it's records 15-6, 19-21. And the defense on cross-examination is questioning Nari about the physical abuse. Did it happen before the baby? Yes. Right. Did it happen after the baby? Yes. That's the problem, because then they're not allowed to go into how the defendant brothers had responded in those prior instances. And I can easily see an argument that the defense should have been allowed to do a lot more than just the orbital bone incident. And if they had been allowed to do that one and maybe a couple more and the judge had cut it off then, I would see a kind of fair symmetry in the trial court's approach to this subject of motive. But I really have trouble with whether this is a reasonable application of Davis and Van Arsdale, that line of cases, when it's so one-sided. And I would agree that this confrontation clause issue, sure, it's a close call. Not necessarily. But when this court is reviewing it, when you look at the Harrington v. Richter language, is it so unreasonable? Is there no justification? Could no reasonable jurist come to this conclusion? Let's apply that test to this language in paragraph 62 of the Wisconsin Supreme Court's opinion about the fact that Davis, the deceased victim, on trial for the alleged prior incidents of domestic violence. The state had just been allowed to do that, correct? Correct. Put Davis on trial for the prior incident, the beating that had occurred the day before he was killed, right? I would agree with that. Second, it would have required the jury to speculate as to whether a lack of retaliation for Davis' prior assaults on Neri magnified Rhodes' motive in this instance. Okay. But it seemed to me that the state's evidence is also asking the jury to, quote, speculate about whether this was sufficient provocation to push these two men to murder their sister's boyfriend, or ex-boyfriend. Sure. And when I was, as I was preparing for oral argument, I have been stuck on paragraph 62 as well. And I think I disagree with how the Wisconsin Supreme Court analyzed how the trial court, what the trial court's decision was in this case. But there are 72 paragraphs in this decision, and I think what the, what they ultimately concluded... Do you want to go through some more? What they ultimately concluded is that the trial court was not wrong for fear of misleading the jury. What was the danger of misleading the jury that was not similarly presented by the state's side of the motive issue? The state's side of the motive issue was that Rhodes was motivated to basically kill Rhodes for what happened to his sister on that day. The theory was that he was motivated to kill Davis. To kill him. So that was the state's motive, and the trial court was concerned about putting Davis on trial. Putting Davis on trial for... Well, the state opened that door. That's the whole theory of the case. That's the problem. But there was, Nari was able to testify to dispute the state's motive theory. Sure she was. And the state Supreme Court makes that point. But take a look at the closing arguments, and the prosecutor is blowing right through those explanations and saying, look at these pictures. It wraps up the opening session of the closing argument by displaying the pictures, and it begins the rebuttal portion by showing the pictures, right? It did do that, but the state also... I would disagree that its focus was the motive in this case. It's not the only focus, clearly. But it's a significant part of its case. I would agree that it's a significant part of its case. If I could briefly turn to the harmless error argument in my case. And to get to that, I think that the fact that the co-defendant, Salim, was acquitted is proof that any error in this case of limiting the cross-examination was harmless because that limiting of the cross-examination affected the defendants equally. So there's no way that the limiting of the cross-examination of Nari contributed to Olu's verdict when it did not contribute to the defendants' verdict. In this case, the state's evidence against Rhodes was just stronger than it was against Salim. You had Rhodes' own testimony. It was, but it's not overwhelming. I mean, you've got a good eyewitness, right? We have two eyewitnesses. You've got two eyewitnesses who ID. One has been rock-solid for the state all through. Why? Right? And his girlfriend, a little shaky at times, but she's pretty good at trial. You don't have physical evidence. You've got an issue about motive. Go ahead. You also have Rhodes' phone call to Letitia Dotson, the date right after the shooting. Can you answer the question I asked Eisenman's counsel? Does that come in as substantive evidence? When I was reading the transcripts, there were no objections when they were asking those questions to the officer about what Letitia told him. Is that common in Wisconsin evidence law, that out-of-court statements come in substantively? Letitia was there to testify against that. Letitia testified, no, I did not say that to the officers. So she came back and said, this is what the officers testify to. I did not say that. So the officers come in first and testify about what she told them about the phone calls? I don't have, I'm sorry, I don't know the question. I actually, I don't know the answer to that question right now. Letitia was the state's witness? Yes, that's correct. Yes, she was. Presumably, the state was aware that she was going to recant what she had told the police? Yes. So it was anticipatory impeachment, essentially, which does happen from time to time. It happens, but without a limiting instruction, which may or may not work, but I know that's not quite the way this whole issue came up, comes up to us, but it just struck me as unusual. I did want to say, I do disagree that of the harmless error that the state has to prove that it's certain. That comes from the, I think it's the Sanders v. Cotton case. And in that case, basically what the, no, actually, I'm sorry, that comes from the O'Neill case. And in that case, that is the Sandoval case, I'm sorry, the court would have to determine that harmless error is certain if harmless error was not raised in the district court. So only if the Seventh Circuit is reviewing harmless error for the first time, then does it have to determine whether harmless error is certain. Ms. Schaefer, you do a lot of habeas work, I assume, right? For about five years, correct. And you probably know better than any of us the intricate procedural rules that are enforced against petitioners. I do. So why should we make a special exception here to relieve the state of the repeated waiver of the opportunity to raise harmless error? The state did not, because harmless error was raised and it was discussed in the district court. The district court asked for supplemental briefing after the petitioner raised harmless error in its reply brief. That's when I became involved in the case. So then they asked for supplemental briefing, and I said, yes, you can consider harmless error. And basically, both parties briefed the issue on harmless error. So I would disagree that the issue of harmless error has been waived when the district court took it upon itself, said, okay, this has been raised by the petitioner, I want some supplemental briefing from you, the respondent. But we both submitted briefs, and ultimately, the district court agreed with the state that there was harmless error. You agree that that's an issue on which we do not owe any deference under 2254D to the state court's determination? It was the only state court determination we got on that it was not harmless. We have a court of appeals decision, but the last court to decide this was the Wisconsin Supreme Court. Which did not address this issue? Did not address it. It only addressed it on the confrontation clause issue. I do want to point out that regarding Nari's testimony, and the petitioner has claimed that it was only brought in to discuss motive, but on the day before when the victim, Jante Watt, was testifying. He testified that when he saw Rhodes following him on the day of the shooting, that Davis was with Jante Watt, and Davis said to Jante Watt, he was nervous, he was concerned. And the reason he was concerned is because Davis was concerned that Rhodes was going to call the cops on Davis for what had happened to his sister. So it gets in before Nari's testimony. If only they had, right? I'm sorry? No, never mind. So I don't think that Nari's testimony was only to show motive. It certainly showed that what happened on April 3rd was connected to the shooting on April 4th. In the victim's mind. I'm sorry, what? In the victim's mind. In the victim's mind.  His guilty conscience, or at least fear, based on his responsibility for the beating that Nari had suffered. Right. And so that testimony was put in before Nari's testimony. And so I don't think that Nari's testimony was only admitted to show motive. It was also showed to complete the story of what happened on the 3rd and on the 4th. Do you want to say anything on the merits of the harmlessness question? You've only got a few seconds left. Oh, well, just to address the Van Arnstall factors. It said that there's a host of factors. One of them was the strength of the state's case. I think I've addressed that already. The fact that there are two different verdicts. So I don't see how the decision to limit the testimony had any contribution on Olu Road's verdict when it didn't have any impact on the co-defendant's verdict. The extent of cross-examination otherwise permitted. There were 25 pages of cross-examination of Nari Road's. And the importance of the witness's testimony. Nari's testimony is another factor that Van Arnstall lists as factors to include. And the state's evidence against Road's was overwhelming. Then the other witnesses testified. You had two eyewitnesses testify. It was Road's. It was Salim. You had Dominique, the Jante's girlfriend, testify. It was them. I saw them. And you had also the victim testify. It was Olu and it was Salim. Thank you. Thank you. Just a couple of real quick points. First of all, this is definitely a case where if this court reaches harmless error, it has to be certain. The state is simply incorrect that this was raised in the district court. Raised does not mean after the district court gets you a do-over and calls you out on your waiver. There are a lot of situations, counsel, though, where district courts have the power to raise issues themselves and relieve parties of bad lawyering. Yes. And even if this court somehow blesses what the district court did, finds that it was exercising its discretion, that this court would then bestow on the district courts, this court still has to review the harmless error issue de novo, and the state's waiver doesn't go away. And so the court in Gover, the Sixth Circuit, was the only court I think out there that has done something like that. It essentially said what the district court did was fine. It was an exercise of its discretion. The discretion will give district courts the ability to raise these issues sua sponte under the Giovannetti factors, which is not what the district court here did. But then we still have to review harmless error de novo, including tipping the scales on the side of the defendant, because of the waiver. The state still waived this issue. That still matters to this court on review. It doesn't get erased when the district court decides to take something up sua sponte. I think that would be the closest match, like I said, if this court somehow blesses what the district court did. The court in Gover says, yep, but we still have this weight on the side of the defendant because of the waiver. This is not a regular Breck analysis. Just got a second. The Saleem acquittal is a red herring. There was already tons of doubt versus Saleem. And the fact that two eyewitnesses testified against Rhodes and against Saleem, the same, they ID'd both of them, and the jury found that that was not enough. It already had a lot of doubt against Saleem. The fact that that doesn't mean that the additional doubt supplied by Nari's testimony wouldn't have made a difference to Olu. Perhaps that would have been what tipped the scales in his favor. So the fact that Saleem was acquitted, especially because the two eyewitnesses testified perfectly exactly against them, that means the jury did not buy the eyewitness testimony, and they already had enough doubt against Saleem. So they just needed maybe a little bit of additional doubt against Olu and Saleem. Both Watt and his girlfriend knew Rhodes and his brother? Yep, beforehand. Yep, knew both of them. Thank you very much. All right. Thank you. And Ms. Van Iseman, your firm has continued to represent Mr. Rhodes by court appointment. Is that correct? No, we're actually retained. You are retained.    Thanks to both counsel. The case is taken under advisement. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.